UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**HOLLY TAKEMOTO-BOYD,**

       **Plaintiff,**              **CIVIL ACTION NO. 9-CV-10329**

    **vs.**                       **DISTRICT JUDGE JULIAN ABELE COOK**

**COMMISSIONER OF**        **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

       **Defendant.**
_____/

## REPORT AND RECOMMENDATION

**I.**    **RECOMMENDATION:**    This Court recommends that Defendant's Motion for Summary Judgment (docket no. 14) be GRANTED and that Plaintiff's Motion for Summary Judgment (docket no. 9) be DENIED, as there was substantial evidence on the record that Plaintiff retained the residual functional capacity to perform her past relevant work.

***

**II.**    **PROCEDURAL BACKGROUND**

Plaintiff filed applications for disability and Disability Insurance Benefits and Supplemental Security Income on February 15, 2006, alleging that she had been disabled and unable to work since November 7, 2005 due to shoulder and ankle pain and depression. (TR 13, 37, 46, 60). The Social Security Administration initially denied her claim. (TR 37-43). Following a July 15, 2008 hearing, Administrative Law Judge Bennett S. Engelman denied Plaintiff's claim by finding that Plaintiff had not been under a disability from November 7, 2005 through the date of the ALJ's August 28, 2008 decision. (TR 13, 18-19, 187). The Appeals Council declined to review the ALJ's decision and

Plaintiff commenced the instant action for judicial review. (TR 2-4). The parties filed Motions for Summary Judgment and the issue for review is whether Defendant's denial of benefits was supported by substantial evidence on the record.

## III.  PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE AND VOCATIONAL EXPERT TESTIMONY

### A.  Plaintiff's Testimony and Reports

Plaintiff was 47 years old at the time of the administrative hearing. (TR 190). Plaintiff has a high school education and past work experience as a painter and painter's helper, a bus driver, and a clerical office worker. (TR 216). Plaintiff worked until November 7, 2005, when her doctor put her on family medical leave following a shoulder injury which had resulted from her painting job. (TR 190-91, 196). Plaintiff testified that shoulder problems prevent her from working. (TR 198).

Plaintiff has pain in her right shoulder and her range of motion is limited to reaching forward, but she cannot stretch her arm out or reach repeatedly. (TR 199). She testified that on a daily basis her right shoulder pain is at a level eight of a scale of ten. (TR 200). She testified that pain in her left shoulder is rated at a level seven to eight and that the left shoulder is "getting to be as bad as [her] right shoulder" because she uses it to compensate for her right shoulder and arm, including in brushing her hair and grooming. (TR 201).

Plaintiff testified that she does not get good rest, she has low energy and she "probably would not be a very productive employee." (TR 204). She explained that her fatigue is a result of getting poor sleep at night. She sleeps for an hour at a time and wakes up due to pain. (TR 205). She usually takes two to three naps or rest breaks per day for thirty minutes to an hour. (TR 205-06). Lying down relieves the discomfort in her shoulders. (TR 206). Plaintiff testified that she took Vicodin every day for approximately a year and she stopped using it when her doctor advised her

2

that she could become addicted to it. (TR 206). At the time of the hearing she testified that she was taking naproxen sodium and Motrin and pain relievers "like that." (TR 206).

She also testified that she had been having problems with depression, she had not sought treatment for it, yet she was considering treatment. (TR 198). She testified that she feels "useless" due to her condition and she has crying spells approximately every day. (TR 207). She has problems concentrating and believes that the depression is affecting her sleeping and eating patterns. (TR 207–08). She testified that she would not say that she is "clinically depressed," but that she is "struggling with it." (TR 208).

### B. Medical Evidence

On July 23, 2005 Plaintiff underwent an MRI of the right shoulder following complaints of pain radiating from the shoulder down the right arm and loss of strength in the right hand. (TR 129). The MRI revealed "[o]steoarthritis of the glenohumeral joint with subarticular cystic geodes in the head of the humerus as well as in the bony glenoid," tiny joint effusion, and "supraspinatus tendinosis without frank rotator cuff tear." (TR 129).

Sydney N. Martin, M.D., saw Plaintiff from September 2005 through December 2005 for complaints of right shoulder trouble. (TR 132-36). Initially, Plaintiff was not taking any anti-inflammatory medication or pain medication for her shoulder. (TR 136). The doctor reported loss of range of motion secondary to pain. (TR 136). He noted that Plaintiff told him that if she could endure the pain, she thought her range of motion would be closer to normal. The doctor reported 140 degrees of forward flexion, true abduction at about 120 degrees, external rotation limited to 70 degrees and internal rotation "not much more than hand to the hip pocket." (TR 136). Plaintiff had trouble getting her hand behind her head. (TR 136). There was "no perceptible weakness to resisted

external rotation or internal rotation." (TR 136). The doctor's impression was that Plaintiff had osteoarthritis of the right shoulder. (TR 137). Dr. Martin did not believe that Plaintiff required surgery at that time, "but she will inevitably require shoulder replacement as time goes on." (TR 137). Plaintiff declined a steroid injection. (TR 137). The doctor recommended treatment with nonsteroidal anti-inflammatory medicines and encouraged Plaintiff to "continue to maintain her range of motion as much as possible." (TR 137). He put her on a work restriction of "no repetitive work above the level of the shoulder and no lifting greater than 10 pounds with the right arm." (TR 137).

Plaintiff returned to Dr. Martin on November 1, 2005 seeking a steroid injection and expressing concern about potentially losing her job and subsequently, her insurance. (TR 135). Plaintiff asked whether there was anything that could be done for her shoulder condition prior to losing her insurance. (TR 135). The doctor "tried to explain to her there is no shoulder replacement known to God or man that we could put into a 44-year-old woman and allow her to go back to doing manual labor and expect it to last much more than 5 or 6 years before the glenoid component comes out." (TR 135). The doctor injected Plaintiff's shoulder with Marcaine and Kenalog and reported that she had "significant relief of her symptoms within about five minutes or so and the plan right now is to simply see her back and start Hyalgan." (TR 135). Plaintiff underwent a series of three Hyalgan injections in December 2005. (TR 132-34). A January 30, 2006 MRI of the cervical spine was normal and an MRI of the left shoulder revealed "[m]oderately severe osteoarthritis of the left shoulder, particularly at the glenohumeral joint and acromioclavicular joint" and "[t]endinosis of the supraspinatus tendon without evidence of complete tear." (TR 115-16).

On February 8, 2006 Plaintiff was examined by James F. Heming, D.O. (TR 114). Dr.

4

Heming reported that Plaintiff had forward flexion in both arms to 140 degrees, external rotation to 45 degrees on the right and 70 degrees on the left with internal rotation to the sacroiliac joint. (TR 113). Plaintiff had +4/5 strength and no instability or subacromial crepitance bilaterally. (TR 113). Dr. Heming's clinical impression was bilateral glenohumeral joint osteoarthritis severe on the left and moderate on the right. (TR 114). The doctor suggested a resurfacing of the right shoulder and stated that at her "young age she would definitely need a repeat surgery at some point." (TR 114). He also advised that a resurfacing or hemiarthroplasty would get rid of "most of her pain but most likely not all of it." (TR 114). He did "not believe a total shoulder arthroplasty would be good in her case secondary to her young age and possible glenoid failure within five years." (TR 114). The doctor noted that Plaintiff advised that she had recently lost her insurance coverage, so there were questions regarding postop treatment. Plaintiff was instructed to explore obtaining Cobra insurance to assist in coverage. (TR 114).

On April 17, 2006 Matthew P. Dickson, Ph.D., Licensed Psychologist, completed a Psychiatric/Psychological Report and examination. (TR 143-45). Dr. Dickson noted that Plaintiff denied suicidal or homicidal ideation and reported having problems sleeping. (TR 144). Dr. Dickson diagnosed Plaintiff with Dysthymic Disorder (300.4) and assigned a GAF of 66. (TR 145). His impression was that Plaintiff's "psychological condition would mildly impair her ability to perform work related activities." (TR 145).

On May 2, 2006 agency medical consultant Byong-Du Choi completed a Physical Residual Functional Capacity Assessment and concluded that Plaintiff has the ability to lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk about six hours and sit about six hours in an eight-hour workday, and is unlimited in the ability to push and/or pull

including the operation of hand and foot controls, except as limited to lifting and carrying. (TR 169-76). Plaintiff is limited to occasional climbing of ramps, stairs, ladders, ropes and scaffolds. (TR 171). Plaintiff is limited in both hands from reaching in all directions including overhead and handling (gross manipulation) and should avoid moderate exposure to vibration. (TR 172-73).

Ronald Marshall, PhD., completed a Psychiatric Review Technique dated May 14, 2006 and diagnosed Plaintiff with Dysthymic disorder. (TR 156). He found that she has mild restrictions of activities of daily living, mild difficulties in maintaining social functioning and maintaining concentration, persistence or pace and has had no episodes of decompensation. (TR 163).

On June 27, 2006 Neha Patel, M.D., examined Plaintiff and noted that she reported pain in the right shoulder worse than the left and that she was unable to sleep. (TR 94). Dr. Patel noted that Plaintiff had limited range of motion to 40-50 degrees abduction, full range of extension, she managed "to do different positions to full extension," and on palpation there was no bony tenderness or neurological symptoms but she had generalized muscular tenderness. (TR 94). The doctor advised Plaintiff to take Ibuprofen 800 mg and Skelaxin 800 mg and prescribed Elavil for sleeping. (TR 94). He prescribed a refill for Mevacor and advised Plaintiff to go to physical therapy. (TR 93). The record contains the treatment notes of Eugene N. Chardoul, M.D., from November 2005 to November 14, 2006. (TR 99-103, 121). In November 2005 Plaintiff reported to Dr. Chardoul with complaints of a "torn rotator cuff, bicipital tendonitis and severe osteoarthritis of the right shoulder." (TR 121). The doctor reported poor range of motion and pain going into Plaintiff's neck and causing "some headaches." (TR 121). The doctor noted that Plaintiff reported feeling "awful" overall. He put Plaintiff on Family Medical Leave until February 8, 2006. (TR 121).

On September 20, 2006 Dr. Chardoul noted that Plaintiff had reported seeing several doctors

and that one of them told her she needed her shoulder replaced. (TR 101). Dr. Chardoul examined her and responded, "[N]onsense, you have a tendonitis of the right shoulder." (TR 101). Dr. Chardoul determined that "her major problem is that of an inflammatory supraspinatus tendon," gave her a shot of Solu-Medrol and prescribed Prednisone. (TR 101). The doctor recommended use of ice, heat and Codman exercises. (TR 101). On September 27, 2006 Plaintiff underwent another injection of Solu-Medrol. (TR 100). Dr. Chardoul noted that "[s]he is obviously disabled by the pain in her right shoulder, at this time. The question is .. (sic) how disabled? She is a painter and having severe problems at this time." (TR 100).

On November 14, 2006 Dr. Chardoul gave Plaintiff a prescription for Voltaren. (TR 99). He noted that Plaintiff was "really struggling a great deal, at this time." He recommended ice, heat and appropriate therapy. (TR 99). He reviewed the prior records and stated that the MRI showed an intact rotator cuff. (TR 99). He noted that Plaintiff has moderate arthritis of the right shoulder and severe osteoarthritis of the left shoulder at the glenohumeral joint and tendinosis of the supraspinatus with symptoms worse on the right than the left. (TR 99).

### C. Vocational Expert Testimony

The Vocational Expert (VE) testified that Plaintiff's past work as a general office clerk, accounts receivable/payable clerk and/or bookkeeping clerk was sedentary and semi-skilled. (TR 208-09). The VE testified that the duties of Plaintiff's past work would not typically require an individual to use her arms above her shoulders. The VE pointed out that in the file Plaintiff reported that she sat for six hours per day and lifted up to ten pounds and concluded that the majority of the time this job was performed sitting down. (TR 209). The VE testified that the Dictionary of Occupational Titles (DOT) classifies the use of arms and hands in this job as frequent, which is up

to two-thirds of the workday. (TR 209). She testified that the job would not require extension of the arms to their full length with the elbow in a locked position and that when an individual does computer work her arms are close to her body, within ten to twelve inches most of the time. (TR 210). The VE testified that despite Plaintiff obtaining the clerical job under the circumstances of being married to one of the owners at that time, the jobs Plaintiff described performing were as they are generally performed. (TR 210). She testified that if an individual had a mild reduction in the ability to concentrate as a result of pain and/or depression, the individual would still be able to perform this semi-skilled work. (TR 211).

Upon questioning by Plaintiff's counsel, the VE testified that typically one absence per month would be allowed and there would be three breaks allowed in an eight-hour workday, including a short break each in the morning and afternoon and a thirty to sixty minute lunch. (TR 212). A need to nap or lie down at time other than these breaks and lunch would preclude work. (TR 212). A deficit in concentration twenty percent of the time, being the equivalent of one non-productive day per week, would preclude employment. (TR 212).

**IV.     ADMINISTRATIVE LAW JUDGE'S DETERMINATION**

The ALJ found that although Plaintiff had not engaged in substantial gainful activity since November 7, 2005, the alleged onset date, met the insured status requirements of the Social Security Act through December 31, 2010 and suffered from osteoarthritis of the shoulders and dysthymic disorder, she did not have an impairment or combination of impairments that is severe enough to meet or medically equal the Listing of Impairments. (TR 14). The ALJ found that Plaintiff was not entirely credible and she retains the ability to perform a full range of sedentary work including her past relevant work as a general office clerk. (TR 15-18).

## V. LAW AND ANALYSIS

### A. Standard Of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B. Analysis

*1.    Scope of the Court's Review*

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1) she was not presently engaged in substantial gainful employment; and

(2) she suffered from a severe impairment; and

(3) the impairment met or was medically equal to a "listed impairment;" or

(4) she did not have the residual functional capacity to perform her relevant past work.

*See* 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2009). If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider her residual functional capacity ("RFC"), age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled. *See id*. §§ 404.1520(g), 416.920(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

Plaintiff raises three arguments on appeal. Plaintiff argues that the ALJ did not properly evaluate the medical records, the ALJ's findings regarding Plaintiff's credibility and complaints of fatigue and pain are not supported by substantial evidence and the ALJ's decision at step four is not

supported by substantial evidence because the ALJ's hypothetical question to the VE was not accurate. (Docket no. 9).

2. ***Whether the ALJ Properly Considered the Medical Records and Properly Assessed Plaintiff's Complaints of Fatigue and Pain***

Plaintiff argues that the ALJ did not properly assess Plaintiff's credibility, specifically her complaints of pain, and the resulting fatigue and need to take naps and lie down[1]. (Docket no. 9). Plaintiff's argument that the ALJ did not properly evaluate the medical records is tied to her argument that the ALJ improperly relied on the medical evidence to discount her credibility and symptoms and the Court will consider the issues together. (Docket no. 9 at pp. 6 and 12). The ALJ found that while Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," her statements regarding the intensity, persistence and limiting effects of her symptoms were not completely credible. (TR 18).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters,* 127 F.3d at 531. Credibility assessments are not insulated from judicial review. Despite deference due, such a determination must nevertheless be supported by substantial evidence. *See id.* An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p.

To the extent that the ALJ found that Plaintiff's statements are not substantiated by the

---

[1] The only challenges Plaintiff raises with respect to the ALJ's credibility determination are related to her "testimony regarding her naps, fatigue and lying down." (TR 9 at p. 11 and 14).

11

objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements."  20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).  In addition to objective medical evidence, the ALJ must consider all the evidence of record in making his credibility determination.  *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994).

In considering Plaintiff's credibility and the severity of her symptoms and limitations, the ALJ properly considered evidence of the medication and treatment which Plaintiff receives for pain, including its effectiveness.  The ALJ pointed out that Plaintiff's pain symptoms were treated with conservative measures, no surgery was documented by the record and the record did not document any objective decline in Plaintiff's condition or overall level of functioning.  (TR 17).  The ALJ's finding that Plaintiff was treated with conservative measures is supported by the record.  In September 2005 Dr. Martin recommended treating Plaintiff with non-steroidal anti-inflammatory medication and recommended that Plaintiff try to maintain her range of motion "as much as possible."  (TR 137).

In November and December 2005, Dr. Martin treated Plaintiff with pain medication and steroid injections.  (TR 132-35).  Dr. Martin reported that Plaintiff had "significant relief" of her symptoms within five minutes of receiving the first injection.  (TR 135).  In September 2006 Dr. Chardoul gave Plaintiff Solu-Medrol shots.  (TR 99, 101).  In June 2006 Dr. Patel advised that Plaintiff be treated with medication and physical therapy.  (TR 94).  In September and November 2006 Dr. Chardoul recommended ice and exercises or therapy; in November he prescribed Voltaren.

(TR 94, 99. 101). Plaintiff has cited to no medical evidence in the record or any physician's opinion that support her allegations of fatigue or that she needed to rest or lie down during the day. There is no evidence in the record that Plaintiff complained to any treatment provider of fatigue, either secondary to medication or pain, or the need to lie down to relieve pain.

The ALJ also pointed out that the record did not document a surgery. (TR 17). Plaintiff argues that the reason "there is no surgery documented in the record [is] because no doctor wants to operate on her." (Docket no. 9 p. 12). Plaintiff relies on Dr. Martin's statement that there is "no shoulder replacement known to God or man that we could put into a 44-year-old woman and allow her to go back to doing manual labor and expect it to last much more than 5 or 6 years before the glenoid component comes out." (TR 135). The ALJ directly and correctly cited Dr. Martin's September 15, 2005 opinion that Plaintiff would did not really require surgery "right now" but would probably require a shoulder replacement in the future. (TR 137). The opinion that a shoulder replacement surgery would not last more than five or six years if Plaintiff continued doing manual labor is not inconsistent with the ALJ's findings that Plaintiff's treatment continued to be conservative.

The ALJ correctly pointed out the varied opinions regarding whether and what type of surgery Plaintiff needed. (TR 16-17). When Plaintiff reported to Dr. Chardoul that one of the doctors opined that she needed her "shoulder replaced," Dr. Chardoul responded, "Nonsense, you have a tendonitis of the right shoulder." (TR 101). Dr. Heming recommended a right shoulder resurfacing but did not recommend a total shoulder arthroplasty due to her age and a "possible glenoid failure within five years." (TR 114). Due to Plaintiff's impending change in insurance, Dr. Heming advised her to "look into obtaining Cobra type insurance" to assist with post-operative

13

treatment. (TR 114). There is no evidence that Plaintiff pursued the insurance or the surgery. Although the opinions varied regarding the effectiveness of such a surgery if Plaintiff continued to maintain manual labor as a painter, there is simply no opinion that Plaintiff cannot undergo a shoulder surgery, that such surgery would be ineffective or that a shoulder surgery was necessary at that time.

Dr. Martin continued to focus on Plaintiff's concerns about returning to her manual labor job as a painter. (TR 135). The record does not contain evidence from Dr. Martin which conflicts with the ability to do a sedentary job. Dr. Martin gave the following work restrictions: no working above shoulder level and no lifting greater than ten pounds with the right arm. (TR 137). Similarly, Dr. Chardoul's notation that Plaintiff is "obviously disabled by the pain in her right shoulder, at this time. The question is . . (sic) how disabled?" is immediately followed by the comment that "she is a painter and having severe problems at this time," recognizing the implications of Plaintiff's manual labor on her shoulder conditions. (TR 100).

The ALJ discounted only one treating physician's opinion, Dr. Chardoul's September 29, 2006 notation that Plaintiff is "obviously disabled." The ALJ pointed out that Dr. Chardoul's opinion that Plaintiff is "disabled" is not supported by objective evidence and conflicts with record evidence. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Dr. Chardoul's full statement was that Plaintiff is "obviously disabled by the pain in her right shoulder, at this time. The question is ..(sic) how disabled? She is a painter and having severe problems at this time." (TR 100). Dr. Chardoul's statement is ambiguous at best. He labels Plaintiff as "disabled" by pain, and speculates in the same sentence as to her level of disability. His very next sentence states that "[s]he is a painter and having severe problems at this time." In both sentences Dr. Chardoul qualifies Plaintiff's pain and severe

14

problems as related to the present time.

The ambiguity of Dr. Chardoul's comment is compounded by his report that Plaintiff "is a painter," appearing to comment on her disability relative to that particular job. There is no basis for deriving from this statement the conclusion that Plaintiff cannot engage in work requiring a lower exertional level than her job as a painter. The ALJ has given specific reasons for being "unable to accord significant weight" to Dr. Chardoul's statement that Plaintiff is "disabled" and his reasons are supported by substantial evidence. *See* SSR 96-2p; 1996 WL 374188 (The ALJ must give specific reasons for the weight given to a treating source's opinion.).

The ALJ also considered Plaintiff's daily activities in making his credibility determination. The ALJ cited Plaintiff's report that she was able to take care of her personal needs, shop, pay bills and take care of her father, who has dementia. (TR 18, 55). Plaintiff reported that she checks on her father, assists him with dishes and laundry and is able to transport him as necessary. (TR 52). Plaintiff is able to washes dishes, do laundry in small loads and sweep and vacuum once a week. (TR 54). The ALJ's findings regarding Plaintiff's credibility are supported by substantial evidence.

*3.   Whether the ALJ's Findings At Step Four Are Supported By Substantial Evidence*

The ALJ concluded at step four of the disability determination that Plaintiff is able to perform her past relevant work as a general office clerk. Plaintiff argues that the step four findings are not supported by substantial evidence "because each element of the hypothetical [question presented to the VE] does not accurately describe [Plaintiff] in all significant, relevant aspects." (Docket no. 9 at p. 9). The ALJ is not required to rely on the testimony of a VE in reaching the conclusion that a plaintiff may perform her past relevant work, but "*may*" use a VE to assist in making this determination. *See Wright-Hines v. Comm'r of Soc. Sec.*, No. 08-5830 (6th Cir. Feb.

15

23, 2010) (citing 20 C.F.R. § 404.1560(b)(2)); *see also Griffeth v. Comm'r Soc. Sec.*, 217 F. Appx. 425, 429 (6th Cir. 2007). Despite Plaintiff's argument, in a hypothetical question to the VE, the ALJ is required to incorporate only those limitations which he finds credible and supported by the record. *See Casey v. Sec'y of Health and Human Serv.,* 987 F.2d 1230, 1235 (6th Cir. 1993).

The only alleged limitations which Plaintiff identifies in her brief that would preclude her performing her past relevant work as a general office clerk are the fatigue and her need to nap and/or lie down approximately three times per day. The VE agreed that the need to nap and/or lie down at times other than typical breaks and the lunch period would preclude work. (TR 212). As discussed above, the ALJ did not find the extent of Plaintiff's limitations credible and did not err in failing to include this limitation in his questions to the VE.

The ALJ found that Plaintiff has the RFC to perform the full range of sedentary work[2]. (TR 15). The ALJ relied on the VE's testimony about Plaintiff's past relevant work to make a finding at step four that Plaintiff could return to her past relevant work as a general office clerk as the work is actually performed. (TR 18).

Plaintiff was questioned at the hearing and provided extensive testimony about her past relevant work as a general office clerk. The VE testified, based on Plaintiff's report and testimony, that Plaintiff's clerical job which included performing accounts payable, payroll, inventory, entering and paying bills on the computer and stocking shelves was limited to lifting ten pounds at maximum and frequently lifting less than ten pounds. (TR 71-72). The ALJ relied on the VE's testimony to find that this past relevant work was semi-skilled and sedentary in exertion. (TR 18).

---

[2]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a) and 416.967(a).

The ALJ did not present a single encompassing hypothetical question to the VE regarding Plaintiff's past relevant work. The ALJ did, however, walk the VE through a complete line of questioning incorporating each possible limitation and the frequency with which such activity would arise while performing the past relevant office clerk work. Through this line of questioning, the VE testified as to the extent that an individual performing Plaintiff's past relevant work as a general office clerk would have to engage in certain exertional and non-exertional activities including the frequency of the use of hands and arms, the use of arms above shoulder-height and the necessity of stretching arms out to full length. (TR 209-10). The VE testified that the general office clerk job would not typically require an individual to use her arms above shoulder height, would require frequent (up to two-thirds of the workday) but not constant use of her arms and hands, and would not require extending the arms to full length. (TR 209-10).

The ALJ's finding that Plaintiff can perform sedentary work is supported by the opinions of both Dr. Martin, who restricted Plaintiff from lifting no more than ten pounds with the right arm, and the state agency consultant, who concluded that Plaintiff had the ability to lift and/or carry twenty pounds occasionally and ten pounds frequently. (TR 137, 169-76). Although Plaintiff has not argued that the RFC does not adequately account for limitations other than the alleged need to nap and lie down it is worth noting that the VE's testimony regarding the requirements of the general office clerk position do not conflict with limitations set forth by Dr. Martin that Plaintiff should avoid repetitive work above shoulder level and the state agency consultant that Plaintiff should avoid reaching in all directions including overhead. (TR 137, 172). The ALJ's findings at step four are supported by substantial evidence.

## VI.    CONCLUSION

The ALJ's decision is supported by substantial evidence and is within the range of discretion allowed by law. Plaintiff's Motion for Summary Judgment (docket no. 9) should be DENIED, that of Defendant (docket no. 14) GRANTED and the instant complaint dismissed.

**REVIEW OF REPORT AND RECOMMENDATION**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: February 25, 2010        s/ Mona K. Majzoub
                                MONA K. MAJZOUB
                                UNITED STATES MAGISTRATE JUDGE

## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: February 25, 2010        s/ Lisa C. Bartlett
                                Case Manager